Rahim RASHAD, Petitioner,

v.

James T. WALSH, Superintendent,
Southeastern Correctional
Center, Respondent.

No. Civ.A. 98–11669–NG.

United States District Court,
D. Massachusetts.

March 31, 2002.

Max D. Stern, Stern, Shapiro, Weissberg & Garin, Boston, MA, for plaintiff.

Rahim Rashad, Bridgewater, MA, pro se.

William J. Meade, Assistant Attorney General, Criminal Bureau, Boston, MA, for defendant.

### *MEMORANDUM AND ORDER*

GERTNER, District Judge.

For the reasons stated below, Rahim RaShad's Amended Petition for Writ of Habeas Corpus [docket entry # 19] is **GRANTED**.

This habeas corpus petition concerns the application of the Sixth Amendment's speedy trial guarantees. Petitioner Rahim RaShad ("RaShad"), a state prisoner, claims that his speedy trial rights were violated when the state trial court refused to dismiss the indictment against him after the Commonwealth failed to bring him to trial until over five years after he was indicted. He seeks a writ of habeas corpus invalidating his conviction for rape.

RaShad was indicted on February 5, 1987. In October of 1992, five years and eight months later, he was finally brought to trial and immediately moved to dismiss the indictment on speedy trial grounds. The trial court denied the motion, noting that findings of fact would follow. No findings were ever issued. A jury in the Suffolk Superior Court convicted RaShad [1] on October 14, 1992. The court sentenced him to not less than thirteen years and not greater than eighteen years at the M.C.I. in Walpole, Massachusetts. The Appeals Court of Massachusetts ("Appeals Court") affirmed RaShad's conviction in an unpublished memorandum on October 22, 1996. The Supreme Judicial Court denied RaShad's application for further appellate review ("ALOFAR") on December 31, 1996. The trial court later denied RaShad's request for a new trial on October 7, 1997.

RaShad's state court remedies have therefore been exhausted as required by 28 U.S.C. § 2254(b).

I find that RaShad's right to a speedy trial was violated and that the indictment should have been dismissed. Though it is clear that RaShad is at fault for fleeing shortly after the indictment was brought, the delay occasioned by his acts, a period of two years, four months, does not compare to the delay occasioned by the official actors in this case. After RaShad had been apprehended and demanded a speedy trial, the Suffolk County District Attorney's Office ("the D.A.") took over five years to finally bring him to trial.

The Appeals Court found against RaShad, holding that he caused a "sizable portion" of the delay and "acquiesced" in most of the rest. *Commonwealth v. Graham,* No. 94-p—60, slip op. at 4 (Mass.App.Ct. Oct. 22, 1996) [hereinafter "App.Ct.Dec."]. On the one hand, the court's opinion was based on a series of fact findings without record support. Indeed, since the trial court made no findings of fact, the Appeals Court was obliged to substitute its own.

On the other hand, the Appeals Court's opinion is based on a series of legal conclusions that are not spelled out with any degree of clarity. The opinion suggests that RaShad is responsible for the delay because his fugitive status, no matter how long it lasted, somehow relieves the government of its constitutional speedy trial obligations. Even when Massachusetts extradited RaShad to a Texas prison without lodging a detainer that would have made possible his speedy return to Massachusetts under the Interstate Agreement on Detainers, the court still held him "responsible" for the delay.

---

**1.** At the time of the events underlying this petition, RaShad was known to the state trial court as Larry Graham. RaShad also used the alias "Charles McCrary" and was further listed in related indictments and trial transcripts as "Larry McCrary."

Since the court's conclusions involve either findings of fact totally unsupported in the record, or an unreasonable interpretation of Supreme Court precedent, or both, I therefore **GRANT** the writ of habeas corpus on speedy trial grounds.

RaShad also makes other claims as to which he is not entitled to relief. He claims that the trial court violated his rights to due process and trial by jury by instructing the jury on the lesser included offense of rape after deliberations had begun; and that the trial court violated his right to due process when it admitted physical evidence that the Commonwealth failed to disclose until the first day of trial, when the late notice prejudiced RaShad's ability to test the evidence.

## I. *FACTS*

### A. *The Speedy Trial Claim*

RaShad's speedy trial claim depends upon a careful analysis of five periods of time. Since legal responsibility for the delay in each period arguably shifts from one party to the other, depending on the specific facts, I describe each period in detail:

1. *Period One:* **May 27, 1984 – September 16, 1986 (two years, four months): RaShad is a fugitive and is finally apprehended. Accordingly, he is responsible for this delay.**

On May 27, 1984, a rape was alleged to have occurred at RaShad's apartment in Boston's South End. RaShad is alleged to have kidnapped his ex-girlfriend, Denise Rodriguez ("Rodriguez"), from a movie theater, taken her to his apartment, tied her up, and raped her repeatedly. Rodriguez complained to the police on May 29, 1984. A warrant for RaShad's arrest issued that same day.

A few days later, after finding out that a complaint had been brought against him, RaShad, whose true name at the time was Larry Graham, became a fugitive. He departed Boston in June 1984 and resided, at various times between 1984 and 1986, in Dorchester, Brockton, and New York City.

On August 8, 1986, police arrested RaShad in Stoughton, Massachusetts, in a stolen vehicle. He was charged with use of a motor vehicle without authority, and was convicted and sentenced to M.C.I. Norfolk under the false name of Charles McCrary.

Two years, four months passed since the date on which the arrest warrant was issued for RaShad, a delay plainly occasioned by RaShad's efforts to evade apprehension.

2. *Period Two:* **September 1986 – February 1987 (six months): RaShad discloses his true name, and asks to be tried "as soon as possible"; he is indicted soon thereafter: The Commonwealth conceded its responsibility for this delay.**

While at the Norfolk County Jail, RaShad informed officials of his true name, Larry Graham. He was told that a default warrant was outstanding against him in the Boston Municipal Court. On September 16, 1986, RaShad wrote to the Municipal Court, stating that he was incarcerated in the Norfolk County Jail and that he would like to be "brought forward" on the pending charges "as soon as possible." As a result, he was brought into court on November 5, 1986, for a probable cause hearing. Thereafter, RaShad remained in the custody of the Norfolk County Jail.

On February 5, 1987, a Suffolk County grand jury returned indictments against RaShad charging him with three crimes: one count of aggravated rape, Mass.Gen. Laws ch. 265, § 22(a); one count of kidnapping, Mass.Gen.Laws ch. 265, § 26;

and one count of assault by means of a dangerous weapon, to wit: a knife, Mass. Gen.Laws ch. 265, § 15B(b).

Significantly, the Commonwealth concedes that it was responsible for this delay (six months).

3.  *Period Three:* **February 1987 – August 1990 (three years, six months): The Commonwealth transports RaShad to Texas to face charges there, but neither lodges a detainer nor takes any steps to bring him back to Massachusetts: The legal significance of this period is contested.**

Before RaShad could be arraigned, the Commonwealth transported him to Texas, where he served a three and one-half year sentence for burglary. On March 10, 1987, the date of his arraignment, RaShad obviously could not answer the charges. Unaware of RaShad's whereabouts, the magistrate noted that RaShad had previously filed a motion for speedy trial, and a writ of habeas corpus was issued for March 27, 1987. When RaShad did not appear in court on that date, the magistrate made an inquiry to M.C.I. Norfolk and was informed that RaShad had been extradited to Texas. The magistrate issued a default warrant for RaShad's arrest, adding that he was doing so "in order to get the process working under the [interstate] compact to begin the process of bringing him back to Massachusetts." [2] (He was obviously referring to the Interstate Agreement on Detainers, Mass.Gen.Laws ch.

276 App., § 1–1 *et seq.* .) And the magistrate reiterated: "The only way we're going to get him back is through some form of the process, a Governor's warrant." [3] The Commonwealth, however, did not follow the magistrate's lead. It took no further steps to obtain RaShad's return from Texas; the docket report indicates solely that the "[i]ndictment [was] placed on file until after arrest of the defendant." [4]

RaShad remained in custody in Texas until August 1990.[5] While he was in a pre-release program in Texas, he applied for a Texas driver's license. During the routine background check associated with getting a driver's license, the Texas Department of Public Safety learned that there were charges pending against RaShad in Massachusetts. The state police took RaShad into custody while the Texas state parole office faxed an inquiry to Massachusetts law enforcement authorities to determine whether Massachusetts was seeking RaShad's arrest and return.

Significantly, Texas authorities informed RaShad that, while state charges were pending against him, Massachusetts was *not* seeking his arrest, as there was no warrant in the system. He was released from their custody back into the pre-release program.

Responsibility for delay in this period (three years, six months) is contested.

4.  *Period Four:* **August 1990 – March 1992 (one year, seven months): RaShad returns to Massachusetts**

---

2.  Petitioner's Memorandum in Support of Petition for Habeas Corpus, Exhibit B, Transcript of the proceedings, March 19, 1987 and March 27, 1987, at 7 [hereinafter "RaShad Mem., Exh."].

3.  *Id.*

4.  RaShad Mem., Exh. A, at 17.

5.  The bulk of the information concerning events following RaShad's release from the Texas penitentiary is derived from his testimony at the hearing on his motion to dismiss the indictment for speedy trial violation. *See* Transcript of Motion Hearing, Oct. 7, 1992, at 28 *et seq.* [hereinafter "Motion Tr."]. RaShad was the only witness to testify at the motion hearing. His testimony was uncontradicted by police reports or other evidence.

voluntarily and uses his true name, even when stopped for motor vehicle violations and posting bond for a friend: The legal significance of this period is contested.

By November 1991, after completing the halfway house program in Texas, RaShad returned voluntarily to Massachusetts. He lived openly, under his own name. Subsequent events in Massachusetts confirmed the information he had received in Texas—that the Massachusetts authorities were not seeking his arrest. He was stopped twice by police officers for motor vehicle violations, provided his driver's license and registration, and was neither informed of pending charges nor arrested. He posted bail for a friend, and a subsequent court check of his driver's license turned up no warrants. He even spoke with Rodriguez, the complainant, who told him she did not believe charges were pending against him.

The Commonwealth contests its responsibility for this delay (one year, seven months).

5. *Period Five:* **March 1992 – October 1992 (six and a half months): RaShad is arrested on the default warrant for the rape charges and gives his true name to the Court but denies being the same "Larry Graham" who had been charged with a 1987 rape: The parties dispute the legal significance of these actions but agree that the lapse of**

time was due to continuances requested by RaShad.

On March 19, 1992, RaShad was detained briefly during an Immigration and Naturalization Service ("INS") investigation of an individual occupying the same dwelling. The INS agents conducted a field interrogation report. RaShad gave them his true name and identification for purposes of the report.

A routine check using RaShad's true name, Larry Graham, turned up the default warrant for the rape charges. RaShad told the INS officer that he "knew nothing" about the charges.[6] The INS then arrested RaShad and had the Boston Police pick him up.

The next day, on March 20, 1992, RaShad was arraigned and pled not guilty to all charges. At this point the record, as reconstructed at the hearing on RaShad's speedy trial motion, is less than clear: On the one hand, he provided the court with his true name and date of birth, as he had to the INS. On the other hand, he denied being the person who committed the crime against Rodriguez and who was charged with rape.[7] He admitted that in the days following his INS arrest, he was attempting to avoid being prosecuted for rape.[8]

However one characterizes RaShad's behavior after his 1992 arrest, it did not obstruct the government's prosecution of him; all the government needed to proceed was his true name and date of birth, and he disclosed that information voluntarily. Thereafter, RaShad was involved

6. Motion Tr. at 37.

7. The transcript of the motion hearing indicates a substantial degree of confusion as to what exactly RaShad denied, and the parties continue to disagree on the matter. Motion Tr. at 39–40, 52–54. *See* discussion *infra.*

8. The relevant portion of the transcript is as follows:

Q [The Court]: Is it fair to say when you were denying that you were the person charged with this crime, you were attempting to avoid being prosecuted for the crime?
\*\*\*
A [Petitioner]: Yes, it is.
Motion Tr. at 54.

in preparation for trial, and the parties agree that any delay in bringing him to trial that occurred between March 20, 1992, and his eventual trial date in October was caused by RaShad's own motions for continuances.

The parties agree that responsibility for this period of time, insofar as it resulted from the trial court's grants of continuances, lies with RaShad (six and a half months). However, the parties dispute whether RaShad was attempting to obstruct justice at the beginning of this period, and they dispute the legal significance of those actions.

## B. *The Motion Hearing*

Prior to the start of trial in Superior Court on October 7, 1992, RaShad moved to dismiss the indictment on the ground that he had been denied his Sixth Amendment right to a speedy trial. The court held an evidentiary hearing at which RaShad was the only witness. RaShad informed the court of the events leading up to his arraignment in 1992: his transfer to Texas, his efforts to contact his lawyer while behind bars, the information he received from the Texas authorities, and his return to Massachusetts. His testimony was uncontradicted.

The state agreed that it had never lodged a detainer in Texas or taken any other steps to obtain RaShad's return from Texas. All it did was issue a default warrant, which only the INS had managed to uncover; the Texas authorities, when they inquired upon RaShad's release from a Texas prison, did not, nor did the Boston Police when they picked him up for motor vehicle violations, or the courts when they permitted him to post bail for a friend. · While the trial court denied RaShad's motion with "findings and ruling to follow," the court never issued those findings. On appeal, the Massachusetts Appeals Court

rejected the claim in an unpublished memorandum order, in which it concluded that "except for the defendant's notice to the Court in September 1986," there was "inaction and avoidance" on his part. App.Ct. Dec. at 3. Because RaShad himself caused "a sizable portion of the delay," and because he failed to prove that the portion he did not cause prejudiced his case, the Appeals Court concluded that it "discern[ed] no constitutional infirmity" in the facts and law of the trial court decision. App.Ct. Dec. at 1 (citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and *Commonwealth v. Gove*, 366 Mass. 351, 320 N.E.2d 900 (1974)), 4.

## C. *Trial Issues as Grounds for Habeas Petition*

### 1. *Admission of Evidence*

RaShad's trial began on October 7, 1992. The first issue that concerns us here relates to the admission of physical evidence. On May 27, 1984, the day Rodriguez reported the alleged crime, she gave the police a piece of rope, a pair of socks, and a towel with tape on it that RaShad allegedly used to restrain her while he raped her. Boston Police Officer Francis Armstrong placed the evidence in a bag in an evidence locker under his custody—and forgot about it. He did not rediscover the bag until the first day of the trial, at which time he supplied it to the parties. The prosecution conceded that RaShad had late notice of the evidence.

RaShad objected to the admission of the evidence because he was unable to perform adequate testing on the items. The judge ruled the evidence admissible and offered RaShad the option of hiring an expert to examine it. Defense counsel refused, stating that he had made several inquiries and hiring an expert at that point would be "impossible." As a result, the evidence,

not tested by the defense before or during trial,[9] was introduced via Rodriguez's testimony to corroborate her account of the alleged aggravated rape.

### 2. *Jury Instructions*

On October 13, 1992, during the charge conference, the defense counsel requested that the court instruct the jury on the charge of aggravated rape, and *not* the lesser included charge of rape. RaShad's counsel argued that if the jury disbelieved Rodriguez regarding the kidnapping and the assault with a dangerous weapon, then they could not find beyond a reasonable doubt that RaShad had raped her either, because there was no independent evidence to establish a lesser included charge of rape. The Commonwealth did not respond. The court's only inquiry was whether counsel had conferred with RaShad; counsel replied that he had, and that RaShad agreed. The judge then instructed the jury on the charges of kidnapping, assault with a dangerous weapon, and aggravated rape.

During deliberations, the jury sent the judge two separate questions: (1) whether it was possible to convict on aggravated rape if the jury found RaShad not guilty of kidnapping and assault; and (2) whether it was possible to convict on *any* kind of rape if RaShad was found not guilty of kidnapping and assault. Notwithstanding the charge conference, the judge *sua sponte* instructed the jury on the lesser-included offense of rape. Petitioner objected.

9. Petitioner, as part of these habeas proceedings, moved for access to the evidence, which I granted. He then tested the evidence in late 2000, at which point his counsel notified this Court that the testing had proved inconclusive and that his expert consultant informed him that further testing was not likely to be productive. Letter from Max Stern dated December 13, 2000 [docket entry # 52].

On October 14, 1992, the jury found RaShad guilty of rape and not guilty of kidnapping, assault with a dangerous weapon, and aggravated rape. The trial court sentenced him to 13 to 18 years in prison.

### D. *Post–Trial Proceedings*

RaShad appealed, and the Massachusetts Appeals Court affirmed his conviction on October 22, 1996. RaShad then filed an ALOFAR with the Supreme Judicial Court, which was denied on December 31, 1996.

On September 19, 1997, RaShad filed a motion for a new trial on several grounds. This motion was denied on October 7, 1997. RaShad then filed a notice of appeal, which was dismissed on April 23, 1998, for lack of prosecution pursuant to Standing Order 17A of the Massachusetts Appeals Court.

On June 29, 1998, RaShad filed the instant federal habeas corpus petition.[10]

## II. *LEGAL DISCUSSION*

### A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996, amended 28 U.S.C. § 2254 to restrict the power of the federal courts to grant writs of habeas corpus to state prisoners. Post–AEDPA, 28 U.S.C. § 2254(d) provides that a federal court may only issue a writ of habeas corpus if it determines that the state court proceedings:

10. On October 6, 1998, the Commonwealth moved to dismiss the petition for failure to exhaust state court remedies. On December 18, 1998, RaShad amended his habeas corpus petition and withdrew one unexhausted claim. The Commonwealth's Motion to Dismiss was denied on March 4, 1999.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute further provides that "a determination of a factual issue made by a State court shall be presumed to be correct[, and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court elaborated on the "contrary to" and "unreasonable application" clauses of § 2254(d)(1). A state court decision will be "contrary to [ ] clearly established precedent" if the state court either (1) applies a rule that contradicts the governing law set forth in Supreme Court cases, or (2) confronts a set of facts that are materially indistinguishable from those in a Supreme Court decision and nevertheless arrives at a different result. 529 U.S. at 405–06, 120 S.Ct. 1495; *see also, e.g.,* *Hurtado v. Tucker*, 245 F.3d 7, 15 (1st Cir.2001); *Phoenix v. Matesanz*, 233 F.3d 77, 80 (1st Cir.2000). A state court's determination constitutes an "unreasonable application" of the precedent in question based on an objective standard, 529 U.S. at 409, 120 S.Ct. 1495: a standard that requires it to be more than merely incorrect. 529 U.S. at 410–11, 120 S.Ct. 1495; 245 F.3d at 16. Beyond this guidance, the *Williams* Court left it up to the federal judiciary to determine what is objectively

"reasonable" in this context. 529 U.S. at 410, 120 S.Ct. 1495.

With regard to determinations of fact by the trial court, 28 U.S.C. § 2254(e)(1) establishes the general rule of deference:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*See also, e.g., Thompson v. Keohane,* 516 U.S. 99, 107–09, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (interpreting pre-AEDPA version of statute); *Coombs v. Maine,* 202 F.3d 14, 18 (1st Cir.2000); *Pettiway v. Vose,* 100 F.3d 198, 202–03 (1st Cir.1996) (holding that, on habeas corpus review, findings of fact by the state court are to be overturned only if the federal court concludes that such factual determination is not fairly supported by the record).

I am convinced, as I describe below, that the state court's decision here fails on both fronts: It represents an unreasonable application of Supreme Court precedent, and it is based on factual findings wholly without clear and convincing evidentiary support in the record.

**B.** *Speedy Trial Claims*

RaShad argues that the Massachusetts Appeals Court decision denying his speedy trial claim was both "contrary to" and an "unreasonable application of" clearly established Supreme Court precedent—specifically *Barker* and *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).[11] He claims that the

---

**11.** In *Doggett,* the defendant was indicted on drug charges in February 1980; unaware of the charges, he left the country shortly after

his indictment but prior to his arrest by DEA agents. The DEA later learned that he was under arrest in Panama. After a failed at-

state court mischaracterized him as a "fugitive from justice" both while he was in jail in Texas and while he was living in Massachusetts thereafter. RaShad claims that in reality it was the government's duty to bring him to justice and that he did nothing during that period to evade prosecution. Because of the nearly six-year delay in bringing him to trial, RaShad argues that he suffered both actual and presumptive prejudice to his ability to defend himself when his trial did finally occur.

The Commonwealth responds that the Appeals Court correctly found that RaShad himself was responsible for the long delay because he failed to move his case actively forward, both while he was in Texas and thereafter. This course of conduct, according to the government, indicates that RaShad "did not want a speedy trial" and constitutes a pattern of "inaction and avoidance" on his part.

Since there are different standards with respect to my review of state fact findings

and legal conclusions, I will parse the court's decision along those lines.

### 1. Length of the Delay

The Appeals Court found that a delay of either five and a half years (if measured from the date of the February 1987 indictments) or eight and a half years (if measured from the initial filing of charges and issuance of a warrant in May 1984) is sufficient to raise the threshold question of a speedy trial violation. See App.Ct.Dec. at 2. However, observing that "[l]ength of delay [ ] is but one of several factors relevant to the inquiry," Commonwealth v. Gilbert, 366 Mass. 18, 21, 314 N.E.2d 111 (1974), the court went on to consider the reasons for the delay, the defendant's assertion of his right, and the degree of prejudice caused by the delay.

Neither of the parties here contests the Appeals Court's conclusion on this threshold question. See Barker, 407 U.S. at 523, 92 S.Ct. 2182; Doggett, 505 U.S. at 652 n. 1, 112 S.Ct. 2686.[12]

tempt in September 1981 to have Doggett "expelled" from Panama back to the United States, the DEA failed to follow up on Doggett's whereabouts. In September 1982, Doggett returned to the United States, where he lived openly under his own name for the next six years—getting married, earning a college degree, and holding a steady job. In September 1988, the Marshall's Service finally discovered Doggett's presence by performing a simple credit check, arrested him, and indicted him on the 1980 charges.

The Court found that Doggett's right to a speedy trial had been violated. 505 U.S. at 651, 112 S.Ct. 2686. Holding that bad faith on the part of the government was not a prerequisite for a speedy trial violation, the Court found that six years of the delay in bringing Doggett to trial—the six years following his return from Panama—were attributable to the government's negligence. 505 U.S. at 658, 112 S.Ct. 2686. Further, the Court found that the absence of "actual" or demonstrable prejudice was not dispositive of the matter: "[E]xcessive delay presumptively

compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria, ... it is part of the mix of relevant facts, and its importance increases with the length of delay." 505 U.S. at 655, 112 S.Ct. 2686.

12. As the Barker Court explained, the length of the delay functions to some degree as a triggering mechanism, albeit a context-specific one: "because of the imprecision of the right to speedy trial, the length of delay that will provoke [a speedy trial] inquiry is necessarily dependent upon the particular circumstances of the case." 407 U.S. at 530–31, 92 S.Ct. 2182. This type of presumptive prejudice is analytically distinct from the presumptive prejudice arguments RaShad raises with regard to Barker factor (4), which require a separate assessment of prejudice to the defendant caused by the delay. This second type of prejudice, which may be actual or presumptive, will be addressed in more detail below.

## 2. *The Reasons for the Delay*

Central to the Appeals Court's conclusion that RaShad's constitutional right to a speedy trial was not violated was its finding that he directly caused "a sizable portion of the delay," App.Ct.Dec. at 4, and that he was in fact responsible for most of the delay that he did not directly cause. The court bases its finding on a perfunctory analysis of the record—that RaShad was responsible for the initial period of time when he was a fugitive, that the Commonwealth then delayed the proceedings between his apprehension and his transfer to Texas, and that RaShad was responsible again after his release from prison because he was a "fugitive from justice" and "denied his true identity" when he was apprehended. App.Ct.Dec. at 2. As to the period of RaShad's actual imprisonment in Texas, the Appeals Court simply noted that "not once did he contact the Commonwealth in an attempt to bring his case to trial," *id.* at 5 (analyzing RaShad's claim under Mass.R.Crim.P. 36).

There is no contest concerning the first two periods or the last. RaShad was responsible for delays for the first period, from May 1984 through September 1986, when he was a fugitive from justice.[13] The Commonwealth was responsible for the next six months, from September 1986 through RaShad's incarceration in Texas in February 1987. RaShad is also responsible for the period after his arrest in March of 1992 until October 1992, when he filed a number of continuance motions.

The core question here concerns two periods, when RaShad was imprisoned in Texas, and between his voluntary return to Massachusetts and subsequent arrest by the INS. With respect to the period of RaShad's Texas imprisonment, the Appeals Court's decision represents an unreasonable interpretation of the law. With respect to the following period—his voluntary return to Massachusetts—the decision is premised on fact findings without record support.

### a. *Period Three (February 1987 – August 1990): RaShad's Imprisonment in Texas*

As noted above, the Appeals Court's sole treatment of the period of RaShad's incarceration is its note, in the Massachusetts Rule 36 context, that RaShad failed to contact the Commonwealth while he was imprisoned in Texas. The Appeals Court ignored the Commonwealth's concession that it had failed to take steps to bring RaShad back from Texas to stand trial.

The March 27, 1987, transcript indicates clearly that RaShad's counsel, the Commonwealth, and the Superior Court knew that RaShad was in a Texas prison and, further, that he had asserted his speedy trial right shortly before he left. Indeed, the magistrate took great pains to spell out the *Commonwealth's* obligations in light of RaShad's speedy trial demand. He indicated that he was issuing a default warrant for RaShad's arrest "in order to get the process working under the [interstate] compact to begin the process of bringing him back to Massachusetts." And he added, "The *only* way we're going

---

*E.g., United States v. Trueber,* 238 F.3d 79, 87 (1st Cir.2001) (citing *Doggett,* characterizing length of delay as a "double inquiry"); *Look v. Amaral,* 725 F.2d 4, 6 (1st Cir.1984) (characterizing length of delay as both "triggering mechanism" and a factor to be weighed once the inquiry has been triggered).

**13.** The Appeals Court cites *Commonwealth v. Anderson,* 9 Mass.App.Ct. 699, 705, 404 N.E.2d 656 (1980) (finding that reasonable delays by the Commonwealth due to efforts to locate defendant are justifiable and usually excusable, especially when the defendant is a fugitive from justice).

to get him back is through some form of the process, a Governor's warrant." (Emphasis supplied.)

The Commonwealth did not follow through. No detainer was lodged in Texas; no Governor's request was made. The magistrate judge simply issued a default warrant, and the case was placed on file until after RaShad happened to return to Massachusetts and happened to be interrogated by the INS over five years later.

In its brief before the Appeals Court, the Commonwealth agreed that it "should have attempted to gain custody of the defendant while he was in a Texas prison, but did not." Comm.'s Br.App.Ct. at 16.

■ The general rule is clear: Although a criminal defendant certainly has a duty to seek a speedy trial in order to raise a speedy trial claim, *Barker*, 407 U.S. at 536, 92 S.Ct. 2182, the primary burden of prosecution rests with prosecutors and with the courts, *id.* at 529, 92 S.Ct. 2182. And this rule applies with special force where the prisoner is imprisoned in another state and is uniquely powerless to effect his own return.

■ The Interstate Agreement on Detainers was promulgated in response to just this sort of situation. In *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), the Court held that an inmate in one jurisdiction has a Sixth Amendment right to a speedy trial on charges pending in another jurisdiction. A prosecutor must make a good-faith, diligent effort to prosecute promptly those inmates confined in other jurisdictions who request speedy trials. *Hooey*, 393 U.S. at 383, 89 S.Ct. 575. Within a few years, Congress and most state legislatures, including Massachusetts, attempted to address the problem by becoming signatories to the Interstate Agreement on Detainers.[14]

Under the Agreement, the Commonwealth could have pursued any of a number of options. It could have filed a detainer[15] as the magistrate suggested. Once a detainer was filed, pursuant to Article III(c) of the Agreement, the Texas prison authorities would have been obliged to notify RaShad and to inform him of his right to make a request for final disposition of the charges underlying the detainer.[16] And if RaShad made such a request,

**14.** Mass.Gen.Laws ch. 276 App., § 1–1 *et seq.* Article I of the Interstate Agreement states:

> The Party states find that charges outstanding against a prisoner, detainers based on untried indictments, information or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints.

**15.** The United States Supreme Court has defined a detainer as "a request filed by a crimi-

nal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." *Carchman v. Nash*, 473 U.S. 716, 719, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985).

**16.** The form typically recites the identity of the jurisdiction seeking the detainer, the nature of the charge, and "an acknowledgment by the inmate that he has been advised of his right to a speedy trial either under state statute or the state constitution and that the inmate may request that an application for trial be sent to the appropriate prosecutor." Leslie W. Abramson, *The Interstate Agreement of Detainers: Narrowing Its Availability and Applications,* 21 New Eng.J. on Crim. & Civ. Confinement 1, 15 n. 73 (1995).

the Texas authorities would have been required to offer custody of RaShad to the Massachusetts authorities. If Massachusetts refused to accept custody, the charges underlying the detainer would have been dismissed with prejudice. If Massachusetts had accepted custody, it would have been required to try RaShad within 180 days, unless a continuance was granted in open court.

Alternatively, the Commonwealth could have had RaShad transported from Texas to answer the Massachusetts charges on its own, whether or not RaShad agreed. In that instance, the Agreement would have obliged Massachusetts to try RaShad within 120 days of his return.[17]

To be sure, the Agreement by its terms does not require prosecuting authorities to either file a detainer or face dismissal of the untried charges. *See, e.g., People v. Hood,* 223 Ill.App.3d 157, 164 Ill.Dec. 851, 583 N.E.2d 1173 (1991), *appeal denied,* 144 Ill.2d 638, 169 Ill.Dec. 147, 591 N.E.2d 27 (1992). Rather, the obligations of the Agreement are triggered only when the detainer has been filed. But whatever the obligations of the Commonwealth under the Agreement, surely the Commonwealth's failure to lodge a detainer in Texas has significance in evaluating the *Barker* factors in this case, and particularly the

question of who had the greater obligation to take action. RaShad made his desire for a speedy trial known before he was transferred to Texas, and the magistrate had expressly warned the Commonwealth that it needed to initiate a formal process in order to have RaShad returned for trial. The Commonwealth, however, did nothing.

■ One thing is clear: RaShad is surely not responsible for this delay. He simply had no way of getting himself transferred from one state to another, from the custody of one sovereign to another.[18]

### b. *Period Four (August 1990 – March 1992)*

After RaShad was released in August 1990 and until his apprehension in Boston in March 1992, the Appeals Court found that he was again a "fugitive from justice." App.Ct.Dec. at 5. In support of this determination, the court cited only to the Commonwealth's brief at 16. But that brief simply states, with no factual support that "once the defendant was released from the prison in Texas in August of 1990, he once again became a fugitive."

■ If the court is basing this conclusion on fact findings, they are rebutted by clear and convincing record evidence. The Commonwealth does not contest the fact

---

17. Mass.Gen.Laws. Ch. 276; App. § 1–1; Art. IV(a)–(c). One reason for not following through with a detainer, in the face of RaShad's demand and the magistrate's exhortations, is that the Commonwealth did not want to pay for his return. This is not, however, a reason that passes constitutional muster.

18. RaShad testified that he did all he could do, namely trying to call his lawyer to find out about the Massachusetts charges. In RaShad's motion hearing in October 1992, he testified that he made numerous phone calls from jail to his attorney in Massachusetts; in most cases he had to leave messages, but he did get to speak with the attorney on one occasion. RaShad estimated that he had called a total of

four or five times from Texas to determine the status of his case in Massachusetts. Motion Tr. at 51–52. During the hearing, RaShad had the following exchange with the court:

Q [The Court]: Is it fair to say that when you were down in Texas, you were hoping this case would just go away, that it was [sic] be lost? Is that fair to say? ***

A [Petitioner]: No, sir. ***

A [Petitioner]: I wanted to know exactly what was going to happen. I knew what I had did and what I had not did.

Motion Tr. at 52–53.

that RaShad lived openly in Massachusetts under his own name. It does not dispute that RaShad's encounters with law enforcement—the traffic stops, posting bail for a friend—should have disclosed pending charges, but did not. He was not a fugitive as a matter of *fact*.

Nor was RaShad a fugitive as a matter of *law*. *Black's Law Dictionary* defines "fugitive" as "[a] criminal suspect who flees, evades, or escapes arrest, prosecution, or imprisonment, esp. by fleeing the jurisdiction or by hiding." *Black's Law Dictionary* 680 (7th ed.1999); *see also Webster's Third Int'l Dictionary* 919 (1981) (defining "fugitive from justice" as "one who having committed or being accused of a crime in one jurisdiction is absent for any reason from that jurisdiction; *specif.:* one who flees to avoid punishment"). It is difficult to understand how these concepts apply to RaShad's conduct after his release from prison in Texas. RaShad voluntarily returned *to* Massachusetts—the jurisdiction in which he had been indicted—and resumed residence there under his own name.[19]

Rather, what the Commonwealth seems to suggest, and the Appeals Court appears to have accepted, is that RaShad was a fugitive because he did not turn himself in as soon as he returned to Massachusetts. In effect, all that matters to the Commonwealth is that "the petitioner left Massachusetts knowing of the charge, returned and was charged with a different crime, was extradited to Texas on yet another crime, knew the charges were pending in Massachusetts, and did not surrender himself." The argument comes down to this: RaShad's initial flight (in Period One) trumps his own acts in requesting a speedy trial (in Period Two) and the Commonwealth's conceded inaction (in Period Three). Once a fugitive, always a fugitive. The Commonwealth had no further obligations. The only burdens were on RaShad. So the Commonwealth notes: "[N]ot once did [RaShad] contact the Commonwealth in an attempt to bring his case to trial," either while he was in a Texas prison, after his release in Texas, or after his return to Massachusetts. Thus, RaShad is responsible for the entire period from his incarceration in February 1987 through his arraignment in March 1992, including the period when he was living openly in Massachusetts.

There is no authority—federal or state—for this position. RaShad's initial flight does not relieve the Commonwealth of its constitutional obligations. While it may be true that the Commonwealth's failure to lodge a detainer does not necessarily mean that a given defendant is *not* wanted, its failure to pursue that defendant diligently while he is openly present in the jurisdiction and taking no steps to evade arrest *is* certainly relevant.

Finally, the Appeals Court supports its conclusion that this entire two-year delay after RaShad's release from prison in Texas is attributable to RaShad based on its finding that "[w]hen he [RaShad] was ap-

---

**19.** In contrast, in *Strachan v. Colon*, which the Commonwealth urges should guide my decision here, the defendant was wanted in Florida, moved to New York, and never resumed residence in Florida. His arrest took place in New York. 941 F.2d 128, 129 (2d Cir.1991). Moreover, a closer review of *Strachan* reveals that its discussion and the authorities it cites on the Extradition Clause and fugitive status focus almost exclusively on de-

fendants who flee the jurisdiction and remain there while the prosecutor seeks to bring them to trial. *E.g.*, 941 F.2d at 130 (citing *Hogan v. O'Neill*, 255 U.S. 52, 56, 41 S.Ct. 222, 65 L.Ed. 497 (1921), for proposition that flight from justice involves leaving the jurisdiction); *id.* ("[A]ll that is necessary to make a person a fugitive from justice is that he leave a state under whose laws he has incurred guilt.").

prehended, the defendant denied his true identity," citing to pages 53–54 of the transcript of the hearing on RaShad's motion to dismiss on speedy trial grounds, held in the Superior Court just before his trial in October of 1992.

Even if the Court is correct about its fact findings concerning RaShad's behavior at his arraignment on March 20, 1992, that performance does not reflect on the preceding *two* years, when RaShad was living openly in Massachusetts after his release from prison. The Appeals Court's fact findings are unsupportable.

But the court is not correct about RaShad's performance when he was arrested. When picked up by the INS, on March 19, RaShad gave his true name and identification, "Larry Graham." (Indeed, this is precisely how the INS was able to track down the pending charge.) As to RaShad's performance at his arraignment on March 20, 1992, there is no transcript. The arraignment was reconstructed at RaShad's motion hearing on October 6, 1992. That discussion, which occurred at several different places in the transcript, was as follows:

Q [Prosecution]: Did you deny that you were the person named on these charges of kidnaping?

A [Petitioner]: I denied there was any charges pending against me because as far as me coming, presenting ID to the Boston Police and I was arrested and I assumed there was no charge pending against me. That's what I denied, that I had, that I had not committed no crime, yes, I did.

Q [Prosecution]: And was that continued to another day and then you continued to deny it?

A [Petitioner]: I denied that I actually committed the offense that I was— what I am presently here for.

Q [Prosecution]: Did you say that he is not me, I have never been arrested?
***
A [Petitioner]: No, I did not.

Q [The Court]: The question was, did you say, that's not me, meaning the person who has been charged with this crime, I have never been arrested? Yes or no.

A [Petitioner]: I never been arrested for this crime.

Q [The Court]: No, no. Did you say, that's not me, referring to the person who had been charged with this crime; that is, the aggravated rape of Ms. Rodriguez? Did you say, that's not me, I have never been arrested? That's the question.

A [Petitioner]: That I never been arrested, no.

Motion Tr. at 39–40.

Q [The Court]: And when you came here, you were in this courthouse, you denied or did you deny that you were the person who had been charged with this crime?

A [Petitioner]: Yes, I did.

Q [The Court]: You did. So when you were actually in this courthouse, sometime last spring, you denied in court that you were the person charged with this crime, is that correct?

A [Petitioner]: Yes.

Q [The Court]: So is it fair to say you were avoiding having the court determine that, in fact, this case was pending against you?
***
A [Petitioner]: I assumed the charges was dismissed.
***
Q [The Court]: Is it fair to say when you were denying that you were the

person charged with this crime, you were attempting to avoid being prosecuted for the crime?

\*\*\*

A [Petitioner]: Yes, it is.

\*\*\*

Motion Tr. at 53–54.

The testimony indicates a fair degree of confusion on the part of both the questioners and RaShad as to what exactly was being asked. What is clear is that RaShad did not "deny his true identity," as the Appeals Court found. An equally, if not more, plausible reading would indicate that RaShad denied that he was the person with charges pending against him because he did not think—or was hoping against hope—that there were any such charges. But he clearly accepted the fact that he was "Larry Graham." It seems as likely that the miscommunications reflected in the motion hearing could also have happened at the arraignment itself.

In this context, evaluating RaShad's testimony, the absence of fact findings by the trial court is significant. A great deal may well have hinged on RaShad's tone of voice and demeanor during the speedy trial motion hearing. Absent the trial court's input, the cold record is simply inadequate to bear the weight of the Appeals Court's conclusions.

Finally, even if I were to credit fully what appears to have been the Appeals Court's interpretation—i.e., that RaShad said that he was not *the same Larry Graham* who had been charged with aggravated rape—I cannot agree that this is substantial evidence of RaShad's avoidance when considered as a part of the larger picture.

### c. *Appeals Court Conclusion*

Thus, the Appeals Court's conclusion that "since the defendant acquiesced in, or was directly responsible for, *most of the delay* in bringing this case to trial, there was no error in denying the defendant's motion to dismiss," App.Ct.Dec. at 4 (emphasis supplied), was based on its characterization of the period of time when RaShad was imprisoned in Texas and after his release, when he voluntarily returned to Massachusetts and lived openly here.

To the extent this conclusion pivoted on findings of fact, they were rebutted by clear and convincing record evidence. To the extent that it represented a legal conclusion, it comprised an unreasonable application of the law.

I will now proceed to *Barker* factor (3) and assess RaShad's assertion of his speedy trial right.

### 3. *Assertion of Speedy Trial Right*

The Appeals Court stated simply that, other than RaShad's letter to the court dated September 1986, the record indicated "inaction and avoidance" on his part. App.Ct.Dec. at 3. The Appeals Court observed that a defendant makes a persuasive case that his speedy trial right was violated "if he has established on the record that he diligently sought a trial," *Commonwealth v. Beckett*, 373 Mass. 329, 333, 366 N.E.2d 1252 (1977). However, inaction on the defendant's part must be weighed against him. *Commonwealth v. Look*, 379 Mass. 893, 900, 402 N.E.2d 470 (1980).

The Appeals Court agreed that RaShad asserted his speedy trial right clearly and unequivocally in his letter of September 19, 1986. The legal question, then, is twofold: First, whose responsibility it was to keep RaShad's trial moving forward once he had requested it; and, second, whether RaShad's conduct after September 1986 may fairly be characterized as inaction or

avoidance sufficient to constitute "acquiescence" in the delay.

■ As I have already observed, the Supreme Court was explicit in *Barker* and *Hooey* that the primary responsibility for bringing a criminal defendant to trial lies with the government. *Barker*, 407 U.S. at 529, 92 S.Ct. 2182 (observing that "the rule we announce today, which comports with constitutional principles, places the primary burden on the courts and the prosecutors to assure that cases are brought to trial"); *Hooey*, 393 U.S. at 382–83, 89 S.Ct. 575 (holding that, once the petitioner requested a speedy trial, the state "had a constitutional duty to make a diligent, good-faith effort" to bring him to trial); *see also United States v. Fay*, 505 F.2d 1037, 1040 (1st Cir.1974). The defendant's duties are (1) to assert the right to a speedy trial, and seek to be brought forward; and (2) to comply with the state's efforts to bring him to trial, not to hinder them or acquiesce in the delay.

This case is markedly different in both respects from the many other speedy trial cases where the defendants kept their mouths shut either throughout the delay or until late in the game, hoping that the state had lost interest in prosecuting them or just seeking to put off trial and/or prison. *E.g.*, *Look v. Amaral*, 725 F.2d at 6–7 (petitioner "remained silent throughout the Commonwealth's long delay," where "some inquiry by Look as to the status of the action against him might easily have remedied the situation"); *Trueber*, 238 F.3d at 90 (petitioner did nothing to expedite his trial "for nearly nine months following his arrest, . . . and did not raise the issue until one month after the case was on appeal" to the First Circuit); *United States v. Colombo*, 852 F.2d 19, 26 (1st

Cir.1988) (observing that the defendants were "content to wait until assertion of the right became a possibly viable way to preclude consideration of the merits of their case"). Rather, RaShad asserted his speedy trial right, admittedly not from the very outset, but from the time he was taken into custody in M.C.I. Norfolk in 1986.

■ Moreover, even after RaShad raised the speedy trial issue in 1986, he was in complete compliance with the state's efforts to bring him to trial—at least, insofar as he could be while he was (1) incarcerated in Texas and (2) unaware that, despite repeated background checks to the contrary, charges were in fact still pending against him. As discussed above, while RaShad was in Texas, his fate was in the hands of the Commonwealth and of the Texas state government. While he was in jail and after he was released, the Commonwealth made no effort whatsoever to prosecute RaShad, or even to notify him that he was still wanted by lodging a detainer in Texas. And the Appeals Court's conclusion that RaShad denied his true identity when he was apprehended in March 1992, App.Ct.Dec. at 2, is, as described above, totally belied by the record.

#### 4. *Prejudice*

Regarding the fourth *Barker* factor, prejudice, the Appeals Court stated, citing *Gove*, that RaShad did not establish prejudice sufficient to warrant dismissal. 366 Mass. at 360, 320 N.E.2d 900 ("The burden is on the defendant to demonstrate prejudicial delay sufficient to warrant dismissal.") The court observed that RaShad had failed to assert by affidavit or otherwise that the guard would corroborate his story,[20] and that RaShad made no showing of

---

**20.** *See Commonwealth v. Underwood*, 3 Mass. App.Ct. 522, 531, 335 N.E.2d 915 (1975) (stat-

ing that allegations that witnesses were deceased "should have been supported either by

any "futile or frustrated efforts" to locate the alleged witness. App.Ct.Dec. at 3. Moreover, the Appeals Court noted that the impairment of the complainant's memory would only affect the ability of the prosecution to convict, and RaShad was required to establish that delay prejudiced *his* testimony. *Id.* Thus, the court held that RaShad did not establish that the evidence in question would have assisted him. App.Ct.Dec. at 4.

■■■ The Supreme Court held in *Barker* that analysis of the "prejudice" factor should proceed in light of the defendant's interests that the speedy trial right was designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." 407 U.S. at 532, 92 S.Ct. 2182. The Court has also been explicit that a habeas petitioner need not necessarily demonstrate prejudice "affirmatively" in order to prevail on a speedy trial claim; rather, what prejudice may have occurred simply factors into the general *Barker* balancing test. *Doggett*, 505 U.S. at 655, 112 S.Ct. 2686 (showing of actual prejudice not required because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify"); *Moore v. Arizona*, 414 U.S. 25, 26, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *Barker*, 407 U.S. at 533, 92 S.Ct. 2182. Another way of putting this is that some degree of prejudice to the defendant, varying directly with the length of the delay involved, may be "presumed," and that this

type and degree of prejudice may be sufficient in light of the overall balance to make out a claim of a speedy trial violation.[21] *Cf. Hooey*, 393 U.S. at 378–80, 89 S.Ct. 575 (presumptive prejudice is "aggravated and compounded" when the accused is imprisoned in another jurisdiction).

Thus, in my analysis of this fourth *Barker* factor, I will consider both any claims of actual prejudice raised by RaShad and the degree of prejudice that may be presumed in light of the length of delay now attributable to the Commonwealth's negligence.

As the First Circuit has observed, where the other *Barker* factors are heavily weighted, the need for demonstrating prejudice at all, whether actual or presumptive, is greatly diminished. *See United States v. Fay*, 505 F.2d 1037, 1039 (1st Cir.1974). Because, under *Barker* and *Doggett*, the need to prove actual prejudice varies directly with the length of the delay attributable to the government, the most plausible interpretation of the Appeals Court's decision is that it attributes a relatively small percentage of the total delay to the Commonwealth's negligence (September 1986 through February 1987 only), and thus that it assigns RaShad a correspondingly greater burden of proving actual prejudice than Doggett's.

Because the Appeals Court's analysis of the reasons for the delay was clearly unreasonable in light of *Barker, Doggett,* and the facts of this case, I find that the vast majority of the extraordinary delay in this case—five years and eight months—is attributed to the Commonwealth's negligence. Moreover, because I find that

---

affidavits or by evidence introduced at the time the motions to dismiss were argued").

**21.** Insofar as the Appeals Court may have held to the contrary in requiring RaShad to demonstrate "actual" prejudice in order to obtain relief, I find that this holding was clearly contrary to the Supreme Court's hold-

ings in *Barker* and *Doggett.* However, it is not entirely clear from the Appeals Court's decision whether it was insisting on "actual" prejudice or simply arriving at a different calculus of "presumptive" prejudice based on the portion of the delay it attributed to RaShad.

RaShad *did* clearly assert his speedy trial right, and because he is not to be faulted for not reasserting it more strenuously from the vantage point of Texas prison and thereafter, *Barker* factor (3) also weighs more heavily against the requirement of prejudice.

Where this amount of time has elapsed, as the *Barker* court observed, major concerns arise as to impairment of the accused's ability to mount a defense; this possibility is especially troubling because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. This type of prejudice could be "presumed" in a case with this length of delay regardless of whether it were actually demonstrated. *Doggett*, 505 U.S. at 655, 112 S.Ct. 2686.

Here, RaShad has actually highlighted some specific respects in which his defense could well have been impaired, most notably with regard to testing the physical evidence, but also with regard to sentencing, as I describe below.

RaShad claims that he did suffer demonstrable prejudice as a result of the delay involved here:[22] that (1) the delay deprived him of the possibility of serving concurrent sentences for his Texas and Massachusetts convictions, and that he was prevented from (2) locating a corroborating witness (an apartment security guard who could verify that the complainant came willingly to RaShad's apartment) and (3) testing and challenging the physical

evidence that was not disclosed until the first day of trial.

As to the impossibility of serving concurrent sentences, RaShad is on strong ground. Viewed ex ante, as the Appeals Court has observed before, the impossibility of concurrent sentencing need not necessarily be prejudicial to the defendant in terms of the overall time served; "[e]ven if [ ] delay made impossible the imposition of concurrent sentences, the trial judge was 'not ... without power to fashion a disposition equally as favorable to the defendant as concurrent sentences.'" *Commonwealth v. Willis*, 21 Mass.App.Ct. 963, 966 n. 5, 488 N.E.2d 1193 (1986) (citing *Commonwealth v. Imbruglia*, 377 Mass. 682, 690, 387 N.E.2d 559 (1979)); *see also United States v. Cabral*, 475 F.2d 715, 719–20 (1st Cir.1973). However, in RaShad's case, the passage of time deprived RaShad both of his ability to serve the sentences concurrently and of his ability to obtain a second disposition that might account for the lack of opportunity for concurrent sentencing.[23]

As to the security guard who allegedly could have testified on RaShad's behalf, I agree with RaShad that he is not required to obtain the guard's testimony or to prove definitively that it would have helped his case as a precondition for demonstrating prejudice without it. To a degree, the passage of time coupled with RaShad's transfer plainly makes it even more difficult for him to reconstruct what the guard might have said.

---

**22.** RaShad did not discuss actual prejudice at the motion hearing before the trial judge in October of 1992, but his counsel did argue that *Doggett* established that presumptive prejudice was sufficient.

**23.** This is not, of course, to suggest that the Interstate Agreement creates an independent *right* to concurrent sentencing. *See Fex v. Michigan*, 507 U.S. 43, 51 n. 4, 113 S.Ct.

1085, 122 L.Ed.2d 406 (1993). However, the fact that there is no such right, such as might support a separate cause of action, does not detract from the calculus of prejudice here; the fact remains that RaShad was denied any opportunity for concurrent sentencing, an opportunity which he might otherwise have realized, by the delay at issue in this case.

Finally, as to the physical evidence—the rope, socks, and towel—it is important to keep in mind that under *Barker* we are only dealing with one aspect of the "delay": the delay in bringing the case to trial, not the government's late disclosure of the evidence on the first day of trial, which is a separate issue.[24] Nonetheless, I find the First Circuit's framework for analyzing delayed disclosure issues to be instructive here. The First Circuit has observed that, in delayed disclosure cases, "the critical inquiry is ... whether the tardiness prevented defense counsel from employing the material to good effect." *United States v. Osorio*, 929 F.2d 753, 757 (1st Cir.1991) (citing *United States v. Devin*, 918 F.2d 280, 290 (1st Cir.1990)). The principal concern, then, is "whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted." *Osorio*, 929 F.2d at 757.

Tests were finally conducted on the rope, socks, and towel in connection with this petition. They were inconclusive; the record does not show one way or the other whether these unhelpful results were affected by the lapse of time. *See, e.g., Arizona v. Youngblood*, 488 U.S. 51, 54–55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (noting that expert testimony at trial had established that "timely performance of tests with properly preserved semen samples could have produced results that might have completely exonerated" the defendant). But while this showing does not qualify as actual prejudice, they buttress RaShad's claim of presumptive prejudice.

It seems clear to me that these three factors, taken together, are more than sufficient to establish significant presumptive prejudice to RaShad. Any one of them

certainly *could* have resulted in actual prejudice to RaShad, and in some mixture or another, all three may well have done so.

## 5. *Exhaustion*

The Commonwealth argues that two of RaShad's arguments regarding prejudice—the adequacy of presumptive prejudice and the alleged prejudice due to RaShad's inability to serve concurrent sentences—were never presented in state court. While it is true that neither of these specific arguments was raised in RaShad's ALOFAR, this is not necessarily dispositive.

■ Exhaustion obligations mandate that a habeas petitioner present his federal *claim* to the state's highest tribunal, or at the very least, "inform the state court of both the factual and legal underpinnings of the claim." *Scarpa v. DuBois*, 38 F.3d 1, 6 (1st Cir.1994); *see also Casella v. Clemons*, 207 F.3d 18, 20 (1st Cir.2000) (petitioner must demonstrate that he tendered each claim "in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question"). What lies at the core of this inquiry is the notion that the state court had sufficient opportunity to consider and rule on the federal claim if it chose to do so, and that the state court cannot do so if it is unaware that a federal claim is being presented. *See Mele v. Fitchburg Dist. Court*, 850 F.2d 817, 823 (1st Cir.1988) (holding that the petitioner had not exhausted his state court remedies where his ALOFAR "discloses no arguable mention, suggestion, clue, hint, or intimation of the constitutional claims").

---

**24.** RaShad has raised the issue of the government's late disclosure of the evidence as a separate ground for habeas relief; it will be addressed, in turn, below.

The Commonwealth does not contend here that RaShad failed to alert the state courts that he was claiming a violation of his federal Sixth Amendment rights, which is all that the exhaustion doctrine requires. Rather, it simply argues that RaShad presented additional arguments—not even additional *facts* — about the same federal constitutional violations that were not raised in state court. Because I find that any such omission on RaShad's part does not rise to the level required by the exhaustion doctrine, that the state court simply be alerted to the federal nature of the claim, I find that RaShad did exhaust his speedy trial claim in state court before filing the instant habeas petition.

## C. *RaShad's Other Claims*

### 1. *Lesser Included Offense Instruction*

As an entirely separate basis for his petition, RaShad argues that the state trial court's submission of a lesser included offense (simple rape) instruction to the deliberating jury, where the petitioner objected to it, deprived him of his federal due process rights.[25] There are at least two fundamental problems with this claim. First, as the Commonwealth points out, post-AEDPA, § 2254(d)(1) allows for habeas relief only where the state court has acted contrary to, or applied unreasonably, clearly established Supreme Court precedent. While there is abundant Supreme Court case law on when a court is *required* to honor a defendant's request for a jury charge on a lesser included offense, there is no Supreme Court ruling on when a state trial court may *not* include

such an instruction, and thus there is no applicable precedent on which to premise a claim for habeas relief. Second, even in light of cases like *Sansone v. United States*, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965), and *Berra v. United States*, 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013 (1956), which construe Federal Rule of Criminal Procedure 31(c), a lesser included offense may be charged as long as the indictment contains all the elements of both offenses—which was clearly and concededly the case here with regard to aggravated rape and simple rape. Where this is the case, the lesser included offense may be submitted so long as, in light of the evidence presented at trial, the jury could rationally acquit the defendant of the greater crime and convict him of the lesser. *Hopper v. Evans*, 456 U.S. 605, 612, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (citing *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973)). Because the aggravated elements were in fact contested at trial, there was a "rational basis" for the trial judge to submit the lesser included charge to the jury, and I cannot find that the Appeals Court's ruling was objectively unreasonable.

RaShad's claims regarding the timing of the jury instruction are also without merit. In particular, his reliance on *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), to support the claim that the simple rape instruction was coercive is totally inapposite; *Jenkins* was an extremely short and narrow Supreme Court decision in which the Court held that, on the specific facts and in the context of the case in front of them, a trial judge's statement to a deadlocked jury

---

**25.** Insofar as RaShad may be arguing that there was an improper *state* law determination, such a claim is not, of course, cognizable on habeas review. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475,

116 L.Ed.2d 385 (1991) (reemphasizing that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

that "You have got to reach a decision in this case" was coercive. 380 U.S. at 446, 85 S.Ct. 1059.

The *Jenkins* scenario simply does not reflect what happened in this case. Here, in response to two questions from the jury on the first day of deliberations, the trial judge instructed the jury on the lesser included offense of simple rape. ·The jury apparently did not regard the second instruction as coercive, because on the *second* day of deliberations the jury sent a note to the judge indicting that it was deadlocked as to one count, at which·point the judge gave a *"Rodriguez"* instruction reminding the jury that "it's your duty to decide the case if you can conscientiously do so," Trial Tr. at V–6, the federal constitutionality of which is not challenged here. Accordingly, I **DENY** RaShad's petition for writ of habeas corpus on this ground.

## 2. *Admission of Evidence*

Finally, RaShad argues that the trial court deprived him of due process when, on the first day of trial, it allowed the Commonwealth to place into evidence the rope, socks, and towel that allegedly were used on the night of the rape, which had not previously been disclosed to the defense. Again, this claim is only cognizable on habeas review insofar as it challenges the state courts' application of clearly established Supreme Court precedent. Here, RaShad argues that the trial court's admission of the evidence, and the Appeals Court's affirmation thereof, constitutes a misconstrual or misapplication of the Supreme Court's holdings in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d

490 (1995). *See also United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (holding that *Brady* "arguably applies" in three different situations, each involving "the discovery, *after* trial, of information which had been known to the prosecution but unknown to the defense") (emphasis added).

■■■ The Commonwealth maintains that *Kyles* and *Brady* are inapposite because they deal with the total non-disclosure of exculpatory evidence, and not the delayed disclosure of potentially exculpatory evidence prior to the end of trial. Even if I were to find, however, that delayed disclosure is simply a permutation of non-disclosure, and thus that the "delayed disclosure" doctrine is an aspect of *Brady* for the purposes of AEDPA, nonetheless I find that the Appeals Court was not objectively unreasonable in failing to find a federal due process violation.[26]

As discussed above, the First Circuit has essentially established a two-pronged test for delayed disclosure of evidence as a due process violation: First, the information must be material, and second, there must have been demonstrable prejudice to the defense, such that, with the benefit of the information, "a more effective strategy would likely have resulted." *Osorio,* 929 F.2d at 757; *see also United States v. Sepulveda,* 15 F.3d 1161, 1178 (1st Cir. 1993) (observing that the lack of demonstrable prejudice "sounds the death knell" for a delayed discovery claim); *United States v. Ingraldi,* 793 F.2d 408, 411–12 (1st Cir.1986) (holding that "[w]hen the issue is one of delayed disclosure rather than of non-disclosure, [ ] the test is whether defendant's counsel was prevented by the delay from using the disclosed

---

26. *Cf. Youngblood,* 488 U.S. at 57–58, 109 S.Ct. 333 (holding that, absent showing of bad faith, failure on the part of police to preserve potentially useful evidence "of which no more can be said than that it could have been · subjected to tests, the results of which might have exonerated the defendant" does not constitute a denial of due process).

material effectively in preparing and presenting the defendant's case").

Here, the Appeals Court found that RaShad failed to establish that his defense was prejudiced by the late disclosure. Under the circumstances, I cannot say that the court's conclusion falls outside the realm of reason. First, as discussed above in the context of RaShad's speedy trial claim, when the articles in question were ultimately tested, the test results proved to be inconclusive; thus, even had the exact same results been obtained well in advance of trial, it is highly unlikely that the results would have helped RaShad's defense. As it was, at trial, the items simply came in through the victim's testimony as the ones she indicated were used in the aggravated rape; however, as may well be reflected in the jury's "not guilty" verdict on the aggravated rape charge, there was a great deal of other evidence before the jury (e.g., the victim's hospital records) that was *not* consistent with assault or aggravated rape. Particularly in this light, it is difficult for RaShad to demonstrate actual prejudice to his case resulting from the belated disclosure of the items in question.

Finally, as the Commonwealth points out, despite the trial court's suggestion that RaShad should at least try to have the evidence examined during trial, RaShad declined without requesting a continuance. This does not bode well for RaShad's claim in light of the First Circuit's holding that "[a]s a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery." *Sepulveda,* 15 F.3d at 1178.

In light of the outcome of the case and the course the defense took, I simply cannot find that the Appeals Court's conclusions were outside the realm of plausibility. Accordingly, RaShad's habeas petition on "delayed disclosure" grounds is **DENIED** as well.

### III. *CONCLUSION*

The Appeals Court's application of *Barker* to RaShad's case was patently unreasonable. Its holding essentially sought to shift the burden of prosecution from the government to RaShad, and to hold RaShad responsible for the Commonwealth's gross negligence in failing to keep track of him and try him promptly on the rape charge. While speedy trial claimants of course have an obligation to seek trial and to cooperate with the authorities, the Supreme Court and the First Circuit have made it abundantly clear that it is the *government's* job to bring criminal defendants to trial in a manner that safeguards their constitutional rights. Because I find that the Commonwealth did not do so here, and the Appeals Court failed to recognize the lapse, I **GRANT** RaShad's Amended Petition for Writ of Habeas Corpus [docket entry # 19].

**SO ORDERED.**